CULPEPPER, Judge.
This is a suit for workmen’s compensation. Plaintiff contends he is totally and permanently disabled from a back injury sustained while loading a pulpwood truck. There are four defendants: (1) A. M. Thomlinson, owner of the truck, is sued on the grounds that he was plaintiff’s immediate employer; (2) B. D. Wyles, owner of the “wood yard” to which the pulpwood was hauled, is sued on the grounds that Thomlinson was Wyles’s subcontractor; (3) United States Fidelity & Guaranty Company, compensation insurer for Mullins & Parker, pulpwood dealers, is sued on the grounds that Wyles was the subcontractor of Mullins & Parker; (4) International Paper Company, owner of the land on which the wood was cut and also owner of the paper mill to which the wood was shipped, is sued on the grounds that it is the principal of its independent contractor, Mullins & Parker.
A. M. Thomlinson, the alleged immediate employer, made no defense. The three remaining defendants denied any compensible accident or disability and also denied the alleged relationships. It is contended that the only relationship which existed • between these respective defendants was that of vendor and vendee of pulpwood.
After a trial on the merits the district judge held A. M. Thomlinson, B. D. Wyles and United States Fidelity & Guaranty Company liable jointly and in solido for compensation benefits at the rate of $35 per week for a period of 12 weeks only. Penalties and attorneys fees were denied. The plaintiff appealed asking permanent and total disability benefits, penalties and attorneys fees and also that International Paper Company be held liable with the other defendants. United States Fidelity & Guaranty Company answered the appeal, asking that the judgment against it be reversed.
*560 There is little dispute as to the accident. The evidence shows clearly that on November 22, 1960, while carrying a piece of pulpwood on his shoulder, to be loaded on Mr. Thomlinson’s truck, the plaintiff stepped in a small roadside ditch and fell to his knees, suffering an immediate pain in his back, thereafter diagnosed as a lumbo-sacral sprain. Mr. Thomlinson and a fellow employee verified the occurrence of the accident and the fact that it occurred while the pulpwood in question was being produced.
The principal issues concern the relationships between the various defendants. Defendants contend each of these relationships was that of buyer and seller whereas plaintiff contends these relationships were that of principal, contractor and subcontractor, within the meaning of LSA-R.S. 23:1061. The general facts regarding these relationships are as follows: International Paper Company owns paper mills in Natchez, Mississippi and Bastrop, Louisiana, which require large supplies of pulpwood. Each mill estimates its needs for the next thirty days and this is pro rated amongst the various area woods superintendents who are responsible for procuring their allotments of pulpwood. The area superintendents then issue pulpwood purchase orders to certain pulpwood dealers for specified amounts of wood which each dealer may ship, during the following week, to one of the paper mills. International buys wood only from dealers. It does not buy direct from producers.
The particular woods superintendent involved here was Mr. Joseph Hodge, whose area included the parishes of Catahoula, Concordia, Caldwell, LaSalle and parts of Winn and Grant. In this area the International Paper Company owns about 145,000 acres of woodlands. Approximately 50% of the pulpwood obtained by International Paper Company in this particular area comes from its own lands and the other 50% is cut from lands belonging to other parties. Mr. Hodge testified that International Paper Company did not produce, that is cut and haul any pulpwood, not even from its own land, except a small experimental tract not involved here. International sold the growing pulpwood on its land to wood dealers and contends that it thereafter maintains no control or supervision whatsoever over the cutting or resale of the particular marked trees sold.
In Mr. Hodge’s area there are five or six (as best we can determine from the record) pulpwood dealers to whom International Paper Company allocates the weekly purchase orders above described. Mullins & Parker is one of these dealers.
Mr. Hodge and Mr. R. H. Parker, of Mullins & Parker, testified that by a written instrument International sold to Mr. Parker, for a lump sum price, all of the trees marked with a certain color paint, located on a certain tract of land owned by International and known as “Tract 2,” or as the “Old Joe Booth Place.” Mr. Parker was to have a certain length of time within which to remove the trees. We do not find that the written timber deed, or any copy thereof, was actually filed in evidence, but the testimony as to these provisions was received without objection or contradiction. There is no testimony as to what other provisions the deed contains.
Mr. Parker then contacted Mr. B. D. Wyles, operator of a pulpwood yard on a railroad siding at Sicily Island, and asked Wyles to see if he could find wood producers to go on Tract 2 and cut the marked trees. The agreement was verbal and to the effect that, when the pulpwood was cut and hauled to Mr. Wyles’s wood yard, he would pay the producers but withhold $2.75 per cord as stumpage for Mr. Parker. Pursuant to this arrangement, Mr. Wyles verbally authorized, several producers, including A. M. Thomlinson, to cut and haul the wood. Mr. Thomlinson and his crew, including the plaintiff, Floyd A. Townsend, were in the process of loading pulpwood, which they had cut from Tract 2, when the accident in question occurred.
*561 The evidence also shows that all of the wood cut from Tract 2 was hauled by truck to Wyles’s wood yard. He paid the producers and withheld $2.75 per cord as stumpage for Mr. Parker. The wood was then shipped by rail to International’s mill. The bills of lading showed R. H. Parker as the shipper and International as the consignee. The wood was scaled at the mill and then International paid Parker, and Parker paid Wyles, for the number of cords so scaled.
With this general description of the various transactions in mind, let us examine in more detail the particular relationships between the respective defendants. First we will consider the relationship between International Paper Company and Mullins & Parker. Plaintiff contends the alleged sale from International Paper Company to Mullins & Parker was, in effect, the same as the disputed sale in the recent case of Redding v. Cade, 158 So.2d 880 (3rd Cir.App.1963). In the Redding case, Continental Can Company owned the land and contended it sold certain marked trees to Cade-Brewton at a certain price per cord. Cade-Brewton cut the pulpwood and resold it at a higher price per cord to Continental for use by its paper plant. We concluded, under the facts shown, that this was not simply a vendor-vendee relationship but, instead, was nothing more than a contract by which Continental paid Cade-Brewton to cut and haul Continental’s timber to Continental’s paper plant. We noted particularly some of the express provisions of the alleged timber sale: Continental reserved the right to cancel this agreement verbally through its field representative at any time, if in its opinion, “proper forest practices, including normal utilization of available timber, are not being carried out * * * ”; Continental had the right to inspect the cutting operations at any time; Cade was required to cut and remove the trees “in one continuous operation;” Cade had to pay damages if he cut an unmarked tree; Cade was paid by the cord, which meant that the alleged “price” of the sale was nothing more than payment for harvesting, by the cord. We noted also the evidence which showed that actually all of the timber cut on Continental’s land by Cade-Brewton was delivered to Continental’s paper plant. We concluded that “because of the explicit and implicit contractual control exercised by Continental over the pulpwood operations and the pulpwood so produced, including Continental’s power to terminate or to cease to renew the short-term agreement if Cade did not deliver to Continental all of the pulpwood produced * * * ” the relationship was that of principal-contractor and not that of vendor-vendee.
In the present case we do not have in evidence the written contract of sale from International Paper Company to Mullins & Parker and therefore it is not shown that this timber deed contained provisions similar to those noted in the Redding case, which would give International control over the harvesting and resale of the wood. Also, it is not disputed that International sold the timber for a lump sum price, rather than by the cord. Mr. Parker testified that if he didn’t get all of the timber cut within the time specified in the contract or if any of the pulpwood was lost in the cutting, hauling or shipping to the mill, it was Parker’s loss. Actually, Mr. Thompson, an employee of Mullins & Parker, who, as will be pointed out hereinafter, supervised the harvesting operation, testified that due to bad weather they were unable to cut all of the timber on Tract 2 before the contract ended and some of the timber purchased by Mr. Parker was still there. Under these circumstances, Parker was not just being paid by the cord for services rendered in cutting and hauling the wood.
Furthermore, we have the uncontradicted testimony of the International officials as well as that of Mr. Parker that International had no right of control, nor did it actually exercise any control whatever over the harvesting or resale of this timber. Mr. Hodges, International’s area superintendent, testified that on several occasions dealers *562 in his area had sold to other parties pulpwood purchased from International’s land.
We certainly recognize that since International owned the land, sold the -timber, and ultimately bought it back in ■the form of pulpwood, the transaction is -suspicious. But, this factor alone is not -sufficient to negative a vendor-vendee relationship. Counsel have not cited, nor have we been able to find, any case from the appellate courts of this state denying .a vendor-vendee relationship on this ground alone.
In the case of Owers v. Louisiana Longleaf Lumber Company, 14 So.2d 275 (1st Cir.App.1943), cited by plaintiff, the lumber ■company owned the land and contracted with plaintiff’s immediate employer to cut .and haul fence posts from this land at a fixed price per post. The posts were used by the lumber company to fence its plant. The court held this was not a vendor-vendee relationship but was instead nothing more than a contract to pay for services rendered.
The case of Ball v. Keyser Aluminum & Chemical Corporation, 112 So.2d 741 (Orleans App.1959) must have been cited by plaintiff through inadvertence. It holds that an employee of an electrical subcontractor of the prime contractor, engaged in the construction of a new aluminum plant, was not entitled to workmen’s compensation .against the manufacturer of aluminum who was to occupy the plant after completion, -on the grounds that the manufacturer was the principal. The case does not involve vendor-vendee relationships.
Next we will consider the relationship between Mullins & Parker and Mr. B. D. Wyles. As stated above, after Mr. Parker bought the timber from International he contacted Wyles and asked him to find wood producers to cut and haul the pulpwood. Wyles paid the producers and withheld the sum of $2.75 per cord as •stumpage for Mr. Parker. Wyles was paid by Parker a certain price per cord for all wood shipped from his yard to International’s mill.
The evidence also shows that Mr. Parker’s woods foreman, a Mr. Thompson, actually supervised the cutting of the trees to see that only marked trees were cut and, more important, to see that all of the marked trees were cut before the contract time expired. Under the circumstances we have no difficulty in deciding that this was not a vendor-vendee relationship but, instead, was a contract whereby Parker compensated Wyles by the cord for services rendered in seeing that the wood was cut and hauled. Stevens v. Mitchell, 234 La. 977, 102 So.2d 237 (La.Supreme Court 1957); Jones v. Hennessy, 232 La. 786, 95 So.2d 312 (La.Sup.Ct.1957); Kline v. Dawson, 230 La. 901, 89 So.2d 385 (La.Sup.Ct.1956).
Under this same reasoning it is apparent that the relationship between Wyles and A. M. Thomlinson, plaintiff’s immediate employer, was not that of vendor-vendee. As stated above, Wyles authorized Thomlinson, and several other producers, to go on the land and cut and haul the pulpwood at a certain compensation per cord of wood delivered to Wyles’s yard. Thomlinson never became the owner of the trees or the pulpwood, anymore than Wyles did. Thomlinson was simply a subcontractor who was compensated for his services.
The next issue is the duration of plaintiff’s disability. As noted above, the district judge found disability for only a period of 12 weeks. The accident occurred on November 22, 1960 and plaintiff first sought medical attention on November 24, 1960, on which latter date Dr. Thomae, a general practitioner in Jonesville, diagnosed a lumbo-sacral strain. Plaintiff was hospitalized 4 days and then was instructed to go home and stay in bed. Dr. Thomae continued to see and treat plaintiff until January 3, 1961 on which daté he discharged him as being able to return to work.
*563 Following his discharge by Dr. Thomae, plaintiff actually did return to work at various jobs, including driving a pulpwood truck for his brother and operating a drag-line, but contends he still had residual pain in his back. On December 5, 1961 plaintiff, was examined by Dr. Jack H. Phillips, an orthopedic surgeon of Natchez, Mississippi, who found no objective symptoms and was of the opinion that if plaintiff had suffered a lumbo-sacral sprain he had fully recovered. Plaintiff was also examined by Dr. T. D. White of Jonesville on October 10, 1962. This doctor agreed with Dr. Phillips that plaintiff had ample time to recover from any lumbo-sacral sprain suffered in the accident and that he showed no residual symptoms and was able to return to work.
Plaintiff was also examined by Dr. Phillip Bonn, a neurosurgeon of Shreveport, Louisiana, on September 1, 1961 and subsequently, after the trial of this case, on April 19, 1963. On the first examination Dr. Bonn found minimal muscle spasm in the lumbar area, but on the last examination he found no such condition. Dr. Bonn noted particularly the absence of any atrophy which indicated to him that plaintiff had been using his back and legs. He did not think that plaintiff was “a good candidate for heavy manual labor” because of his history of back trouble but he was unable to find any permanent residuals of the accident.
Dr. Heinz K. Faludi, also a neurosurgeon of Shreveport, examined plaintiff on September 1, 1961 and again on April 19, 1963. On the first examination Dr. Faludi felt that Townsend was “still somewhat symptomatic and that he should be able to return to some type of work, but I did not believe that he should lift very heavy objects.” After the second examination Dr. Faludi thought plaintiff should not return to work involving the lifting of heavy objects but did think that he could drive a truck and load it with light objects.
Thus we see that the expert medical testimony is in conflict as to whether plaintiff could have returned to work as. a pulpwood loader. However, we note-that none of the doctors found injury to> any bone or intervertebral disc. Nor did! they find any nerve root involvement or muscular atrophy. The symptoms relied on-by Dr. Faludi and Dr. Bonn were almost entirely subjective. The doctors were generally in agreement that 12 weeks was. ample time within which such a lumbo-sacral sprain should have completely healed. Under the circumstances, we are unable to-say that the trial judge was manifestly erroneous in concluding that plaintiff’s disability was limited to 12 weeks.
The next issue is penalties and attorneys fees, which were denied by the district court. Mr. Wyles testified that he-had no knowledge of plaintiff’s injury, or the fact that he claimed to have been hurt while working on Tract 2, until about May-of 1961, which was 5 or 6 months after the-accident. At that time Wyles received a letter from plaintiff’s attorney. Mr. Wyles. testified he answered the letter, but the nature of this response is not in the records This suit was filed on July 27, 1961. The record does not show that any demand was actually ever made on any of the defendants until suit was filed, except possibly the letter to Mr. Wyles. In view of these circumstances and in view of the doubt and uncertainty regarding the relationship between Thomlinson and Wyles, and between Wyles and Mullins & Parker, we are unable to say that the vendor-vendee defense was not, reasonable or that the defendants were arbitrary in failing or refusing to pay workmen’s compensation. We find no manifest, error in the trial court’s denial of penalties, and attorneys fees.
For the reasons assigned, the judgment: appealed is affirmed. All costs of this appeal are assessed against the plaintiff appellant.
Affirmed.